ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08SD02 : 8 Pages

**IN THE CIRCUIT COURT OF MILLER COUNTY, ARKANSAS**

**PRP II PALS INVESTMENTS TRUST** **PLAINTIFF**

**vs.** **CASE NO. ________________**

**FIDELITY NATIONAL TITLE INSURANCE COMPANY** **DEFENDANT**

**COMPLAINT**

COMES the Plaintiff, PRP II PALS Investments Trust, by and through its attorneys, and for its complaint against Fidelity National Title Insurance Company, states as follows:

1. PRP II PALS Investments Trust (**"Plaintiff"**) is a statutory trust established under the Delaware Statutory Trust Statute, 12 Del. Code §§ 3801 et seq. and, as such, it is located in the State of Delaware.

2. Fidelity National Title Insurance Company (**"Fidelity"**) is, on information and belief, a corporation incorporated under the laws of the State of California with its principal place of business in the State of Florida. Fidelity is the successor in interest to Lawyers Title Insurance Corporation.

3. This Court has jurisdiction of the subject matter and parties to this cause of action and venue is proper in this Court, pursuant to Ark. Code Ann. § 16-60-101(a)(1).

4. On or about December 22, 2003, Andrea Paige Attaway (**"A. Attaway"**) and Marc W. Attaway (collectively, the **"Attaways"**) obtained a loan in the amount of $148,500.00 from WR Starkey Mortgage, L.L.P. (the **"WR Starkey Loan"**). To secure the WR Starkey Loan, the Attaways executed and delivered to WR Starkey a mortgage against a ten acre tract of real property located in Miller County, Arkansas, and described as follows:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND BEING PART OF THE SOUTHEAST QUARTER (SE 1/4) OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION TWENTY (20), TOWNSHIP SIXTEEN (16) SOUTH, RANGE TWENTY-SIX (26) WEST, MILLER COUNTY, ARKANSAS AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING: AT A FOUND 3/4" REBAR FOR CORNER AT THE SOUTHEAST CORNER OF THE SE 1/4 OF SECTION 20, T-16-S, R-26-W, MILLER COUNTY, ARKANSAS;

THENCE: N 87° 44' 09" W, WITH THE SOUTH BOUNDARY LINE OF THE SE 1/4 OF SAID SECTION 20, 502.38 FEET TO A SET 5/8" REBAR FOR CORNER AND BEING THE POINT OF BEGINNING FOR THE HEREIN DESCRIBED TRACT OF LAND;

THENCE: N 87° 44' 09" W, WITH THE SOUTH BOUNDARY LINE OF THE SE 1/4 OF SAID SECTION 20, 814.68 FEET TO A FOUND 1" IRON PIPE FOR CORNER;

THENCE: N 01° 23' 13" E, WITH THE WEST BOUNDARY LINE OF THE SE 1/4 OF THE SE 1/4 OF SAID SECTION 20, 534.75 FEET TO SET 5/8" REBAR FOR CORNER IN THE CENTERLINE OF A COUNTY ROAD;

THENCE: S 87° 44" 90" E, 814.68 FEET TO A SET 5/8" REBAR FOR CORNER;

THENCE: S 01° 23' 13" W, 534.75 FEET TO THE POINT OF BEGINNING, CONTAINING 10.0000 ACRES OF LAND, MORE OR LESS.

(herein, the "**Ten Acre Parcel**"). The county tax identification number for the Ten Acre Parcel is 4344-01.

5. On or about November 5, 2004, A. Attaway acquired thirty (30) acres of unimproved land adjacent to the Ten Acre Parcel (the "**Thirty Acre Parcel**").

6. On or about March 3, 2008, the Attaways obtained a loan in the amount of $184,774.86 from Citicorp Trust Bank, FSB (the "**Citicorp Loan**"). The Citicorp Loan was obtained by the Attaways in order to refinance the WR Starkey Loan and payoff additional liens

then existing against the Ten Acre Parcel. The Citicorp Loan was to be secured by a mortgage against the Ten Acre Parcel.

7. In connection with the Citicorp Loan, Fidelity issued a title commitment to Citicorp with an effective date of February 14, 2008 (the "**Title Commitment**") committing to issue a policy of title insurance insuring Citicorp Trust Bank, FSB, its successors and/or assigns with respect to a mortgage in the amount of $189,242.88. The Title Commitment described both the Ten Acre Parcel and the Thirty Acre Parcel, but then excepted the Ten Acre Parcel, but then identified the property to include the Ten Acre Parcel by tax parcel number 4344-01. The Title Commitment also identified the mortgage in favor of WR Starkey against the Ten Acre Parcel as a mortgage existing against the property to be insured. A copy of the Title Commitment is attached hereto as **Exhibit "1"** and incorporated herein by reference.

8. Subsequently, the Citicorp Loan closed with Citicorp advancing the sum of $184,774.86 in reliance on the Title Commitment.

9. The Attaways executed and delivered to Citicorp a mortgage securing the Citicorp Loan (the "**Insured Mortgage**"), which mortgage was recorded in the real estate records of Miller County, Arkansas on March 18, 2008 at Mortgage Book 2008, Page 5107. The Insured Mortgage reflected the same property descriptions as the Title Commitment. A copy of the Insured Mortgage is attached hereto as **Exhibit "2"** and incorporated herein by reference.

10. Fidelity issued a loan policy of title insurance number 2652792VT to Citicorp as insured effective March 3, 2008 (the "**Policy**") insuring the Insured Mortgage as a first lien against the Ten Acre Parcel. A copy of the Policy is not attached as an exhibit to this complaint because Plaintiff does not have a copy of the Policy. Plaintiff will amend and attach a copy of the Policy when it is obtained in discovery.

11. A. Attaway filed a chapter 13 bankruptcy in the United States Bankruptcy Court for the Western District of Arkansas on October 12, 2012. In her voluntary petition, she listed the Ten Acre Parcel as unencumbered and the Thirty Acre Parcel as encumbered by the Insured Mortgage. Her plan was confirmed on April 17, 2013.

12. Citibank N.A., successor in interest by merger to Citicorp Trust Bank, FSB assigned the Insured Mortgage to Christiana Trust, a division of Wilmington Savings Fund Society, FSB, as Trustee of Normand Mortgage Loan Trust, Series 2013-8 ("**Christiana Trust**") on August 27, 2013, pursuant to an Assignment of Mortgage recorded in the real estate records of Miller County, Arkansas on September 11, 2013 as Instrument Number 2013R008620. A copy of the Assignment to Christiana Trust is attached hereto as **Exhibit "3"** and incorporated herein by reference.

13. The Christiana Trust assigned the Insured Mortgage to Normandy Mortgage Acquisition Company LLC c/o The Palisades Group, LLC ("**Normandy Mortgage**") on April 10, 2015, pursuant to an Assignment of Mortgage recorded in the real estate records of Miller County, Arkansas on June 3, 2015 as Instrument Number 2015R004577. A copy of the Assignment to Normandy Mortgage is attached hereto as **Exhibit "4"** and incorporated herein by reference.

14. Normandy Mortgage assigned the Insured Mortgage to Plaintiff pursuant to an Assignment of Mortgage recorded in the real estate records of Miller County, Arkansas on June 3, 2015 as Instrument Number 2015R004578. A copy of the Assignment to Plaintiff is attached hereto as **Exhibit "5"** and incorporated herein by reference.

15. After receiving the assignment of the Insured Mortgage, Plaintiff discovered that the Insured Mortgage describes both the Ten Acre Parcel and the Thirty Acre Parcel, but then

omits the Ten Acre Parcel through a less and except description (hereinafter, the "**Legal Description Issue**").

16. Plaintiff also discovered an access issue, in that there is not access to the Ten Acre Parcel other than by private road (the "**Access Issue**").

17. Plaintiff submitted a claim to Fidelity by letter dated April 20, 2016. A copy of the claim letter is attached hereto as **Exhibit "6"** and incorporated herein by reference.

18. After initially denying Plaintiff's claim, Fidelity accepted coverage for the Legal Description Issue and the Access Issue by letter dated August 5, 2016. A copy of the letter accepting coverage under the Policy is attached hereto as **Exhibit "7"** and incorporated herein by reference.

19. Initially, Fidelity chose to attempt to remedy the Legal Description Issue by retaining legal counsel to seek reformation of the Insured Mortgage. Specifically, Fidelity retained counsel to file pleadings in A. Attaway's bankruptcy proceeding requesting relief from the automatic stay in order to pursue reformation of the Insured Mortgage in state court. The bankruptcy court denied that motion by Order entered April 27, 2017. Fidelity did not instruct counsel to appeal that Order.

20. Subsequently, by letter dated June 1, 2017, Fidelity notified Plaintiff that liability for Plaintiff's claim "has terminated" and denied Plaintiff's claim. A copy of the letter denying coverage under the Policy is attached hereto as **Exhibit "8"** and incorporated herein by reference.

21. As set forth in the June 1, 2017 letter, the only basis asserted by Fidelity for denying Plaintiff's claim was the failure to give Fidelity notice of the claim prior to the

bankruptcy court's confirmation of A. Attaway's bankruptcy plan, and alleged prejudice to Fidelity as a result.

22. Plaintiff requested reconsideration of Fidelity's denial of its claim by letter dated June 22, 2017, a copy of which is attached hereto as **Exhibit "9"** and incorporated herein by reference.

23. Fidelity denied Plaintiff's request for reconsideration, and reaffirmed its denial of Plaintiff's claim, by letter dated August 16, 2017, a copy of which is attached hereto as **Exhibit "10"** and incorporated herein by reference.

**COUNT I – DECLARATORY JUDGMENT**

24. Plaintiff incorporates herein, as if set forth word for word, all of the preceding allegations of this Complaint.

25. Ark. Code Ann. § 16-111-102 empowers this Court to declare the rights, status or other legal relations of any persons interested, *inter alia*, under any written contract or other writings constituting a contract.

26. As alleged herein and stated in the denial letters attached hereto, the only basis asserted by Fidelity for denial of Plaintiff's claim is the alleged untimely notice of the claim and prejudice allegedly suffered by Fidelity.

27. Fidelity may only rely upon untimely notice if, and to the extent, it suffers prejudice.

28. As a matter of well-established bankruptcy law, Fidelity was not prejudiced by any alleged delay in notice to it, because the damage caused to Plaintiff by the Legal Description Issue was irreparable immediately upon the filing of bankruptcy by A. Attaway. Once the

bankruptcy was filed, reformation of the Insured Mortgage was not available against A. Attaway's bankruptcy estate. *See* 11 U.S.C. § 544.

29. Therefore, Plaintiff is entitled to a declaratory judgment that Fidelity was not prejudiced by any alleged delay in notifying it of Plaintiff's claim from and after October 12, 2012, the date of A. Attaway's bankruptcy filing.

**COUNT II – BREACH OF CONTRACT**

30. Plaintiff incorporates herein, as if set forth word for word, all of the preceding allegations of this Complaint.

31. Pursuant to the terms of the Policy, Fidelity is required to pay Plaintiff for the loss it has suffered by reason of the Legal Description Issue and the Access Issue.

32. Plaintiff has made demand on Fidelity and satisfied all conditions precedent to its right to payment under the Policy, yet Fidelity has failed and refused to pay Plaintiff the loss suffered by it as Fidelity is required to do by the terms of the Policy.

33. Fidelity's failure and refusal to pay Plaintiff its loss under the terms of the Policy is a breach of contract which has proximately caused damages to Plaintiff.

34. Plaintiff gave Fidelity notice of its claim under the Policy and any alleged delay in providing such notice did not prejudice Fidelity. Accordingly, Fidelity's denial of coverage on the purported basis of untimely notice is wrongful and a breach of the Policy. Specifically, the ability of any mortgagee under the Insured Mortgage to reform any part of the Insured Mortgage was foreclosed as a matter of law upon the filing of bankruptcy by A. Attaway. *See* 11 U.S.C. § 544.

35. Fidelity is indebted to Plaintiff under the Policy in the amount of $189,242.88, representing Plaintiff's damages caused by the Legal Description Issue. In addition, Plaintiff is

entitled to twelve percent (12%) damages on the amount of its claim together with interest and reasonable attorneys' fees for the prosecution and collection of this action pursuant to Ark. Code Ann. § 23-79-208.

**JURY TRIAL DEMAND**

36. Plaintiff requests a trial by jury.

WHEREFORE, plaintiff PRP II PALS Investments Trust requests (i) a declaratory judgment as set forth in Count I above; (ii) entry of judgment against Defendant Fidelity National Title Insurance Company in the amount of $189,242.88, plus 12% thereof as damages, as provided by law, for interest, and reasonable attorneys' fees; and (iii) all other proper relief to which it may show itself entitled.

Respectfully submitted,

LAX, VAUGHAN, FORTSON,
ROWE & THREET, P.A.
11300 Cantrell Road, Suite 201
Little Rock, Arkansas 72212
(501) 376-6565 (office)
(501) 376-6666 (facsimile)
gfortson@laxvaughan.com

By: */s/ Grant E. Fortson*
Grant E. Fortson (Ark. Bar No. 92148)
Roger D. Rowe (Ark. Bar No. 85140)

*Attorneys for Plaintiff PRP II PALS Investments Trust*

ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08SD02 : 6 Pages

# LandAmerica® Lawyers Title

## TITLE COMMITMENT

PHONE: (866) 226-8616
FAX: (866) 296-0095

| Order No.: 2654792VT | Search Fee: $ 230.00 |
|---|---|
| **Customer Information**<br>ANDREA ATTAWAY and MARC W ATTAWAY<br>299 PR 1088<br>FOUKE AR 71837<br>County: MILLER | **Client Information**<br>CITICORP TRUST BANK, FSB<br>Attn: MICHAEL SWANZY<br>Loan No: [redacted]368<br>Title Insurance Premium: $306.78 |

**Effective Date:** 02/14/2008 **Search Date:** 02/25/2008

THIS COMMITMENT IS SUBJECT TO AND INCORPORATES BY REFERENCE THE TERMS, CONDITIONS, STIPULATIONS AND EXCLUSIONS FROM COVERAGE CURRENTLY EXPRESSED IN THE STANDARD COMMITMENT FOR TITLE INSURANCE ISSUED BY LAWYERS TITLE INSURANCE CORPORATION.

### SCHEDULE A

1. EFFECTIVE DATE: 02/14/2008 DATE OF SEARCH: 02/25/2008
2. PROPOSED INSURED: CITICORP TRUST BANK, FSB, *ITS SUCCESSORS AND/OR ASSIGNS.*
3. ESTATE OR INTEREST IN THE LAND DESCRIBED OR REFERRED TO IN THIS COMMITMENT AND COVERED HEREIN IS: Fee Simple
4. TITLE IS VESTED IN: A. PAIGE ATTAWAY
5. AMOUNT INSURED: $189,242.88

**EXHIBIT 1**

**LEGAL DESCRIPTION**

THE FOLLOWING LAND LYING IN MILLER COUNTY, ARKANSAS:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND BEING ALL OF THE SOUTHEAST QUARTER (SE 1/4) OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION TWENTY (20), TOWNSHIP SIXTEEN (16) SOUTH, RANGE TWENTY-SIX (26) WEST, MILLER COUNTY, ARKANSAS AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS;

BEGINNING: AT A FOUND 5/8" REBAR FOR CORNER AT THE SOUTHEAST CORNER OF SECTION 20, T16-S, R-26-W, MILLER COUNTY, ARKANSAS;

THENCE: N 01° 21' 00" E, WITH THE EAST BOUNDARY LINE OF THE SE 1/4 OF SAID SECTION 20, 1372.72 FEET TO A FOUND 1" IRON PIPE FOR CORNER;

THENCE: N 87° 55' 40" W, WITH THE NORTH BOUNDARY LINE OF THE SE 1/4 OF THE SE 1/4 OF SAID SECTION 20, 1316.15 FEET TO A FOUND 1 1/2" IRON PIPE FOR CORNER;

THENCE: S 01° 23' 12" W, WITH THE WEST BOUNDARY LINE OF THE SE 1/4 OF THE SE 1/4 OF SAID SECTION 20 1323.30 FEET TO A FOUND 1" IRON PIPE FOR CORNER AT AN EXISTING FENCE CORNER;

THENCE: S 87° 44' 09" E, ALONG AN EXISTING FENCE LINE, 1317.06 FEET TO THE POINT OF BEGINNING, CONTAINING 40.0595 ACRES OF LAND, MORE OR LESS;

SAVE AND EXCEPT THE FOLLOWING TRACT OF LAND:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND BEING PART OF THE SOUTHEAST QUARTER (SE 1/4) OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION TWENTY (20), TOWNSHIP SIXTEEN (16) SOUTH, RANGE TWENTY-SIX (26) WEST, MILLER COUNTY, ARKANSAS AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS;

COMMENCING: AT A FOUND 3/4" REBAR FOR CORNER AT THE SOUTHEAST CORNER OF THE SE 1/4 OF SECTION 20, T-16-S, R-26-W, MILLER COUNTY, ARKANSAS;

THENCE: N 87° 44' 09" W, WITH THE SOUTH BOUNDARY LINE OF THE SE 1/4 OF SAID SECTION 20, 502.38 FEET TO A SET 5/8" REBAR FOR CORNER AND BEING THE POINT OF BEGINNING FOR THE HEREIN DESCRIBED TRACT OF LAND;

THENCE: N 87° 44' 09" W, WITH THE SOUTH BOUNDARY LINE OF THE SE 1/4 OF SAID SECTION 20, 814.68 FEET TO A FOUND 1" IRON PIPE FOR CORNER;

THENCE: N 01° 23' 13" E, WITH THE WEST BOUNDARY LINE OF THE SE 1/4 OF THE SE 1/4 OF SAID SECTION 20, 534.75 FEET TO SET 5/8" REBAR FOR CORNER IN THE CENTERLINE OF A COUNTY ROAD;

THENCE: S 87° 44' 09" E, 814.68 FEET TO A SET 5/8" REBAR FOR CORNER;

THENCE: S 01° 23' 13" W, 534.75 FEET TO THE POINT OF BEGINNING, CONTAINING 10.0000 ACRES OF LAND, MORE OR LESS.

TAX ID #: 4344-01; 4344-00

BEING ALL AND THE SAME LANDS AND PREMISES CONVEYED TO A. PAIGE ATTAWAY BY JASON CHARLES TEMPLE AND DIANE TEMPLE IN A WARRANTY DEED EXECUTED 11/5/2004 AND RECORDED 11/9/2004 IN BOOK 2004, PAGE 6471 OF THE MILLER COUNTY, ARKANSAS LAND RECORDS

# LandAmerica®
# Lawyers Title

## TITLE COMMITMENT

PHONE: (866) 226-8616
FAX: (866) 296-0095

| Order No.: 2654792VT | Search Fee: $ 230.00 |
|---|---|
| Customer Information<br>ANDREA ATTAWAY and MARC W ATTAWAY<br>299 PR 1088<br>FOUKE AR 71837<br>County: MILLER | Client Information<br>CITICORP TRUST BANK, FSB<br>Attn: MICHAEL SWANZY<br>Loan No: [redacted]2368<br>Title Insurance Premium: $306.78 |

**Effective Date: 02/14/2008** **Search Date: 02/25/2008**

THIS COMMITMENT IS SUBJECT TO AND INCORPORATES BY REFERENCE THE TERMS, CONDITIONS, STIPULATIONS AND EXCLUSIONS FROM COVERAGE CURRENTLY EXPRESSED IN THE STANDARD COMMITMENT FOR TITLE INSURANCE ISSUED BY LAWYERS TITLE INSURANCE CORPORATION.

### SCHEDULE B -- SECTION I

THE FOLLOWING ARE THE REQUIREMENTS TO BE COMPLIED WITH;

1. INSTRUMENTS IN INSURABLE FORM WHICH MUST BE EXECUTED, DELIVERED AND DULY FILED FOR RECORD;

1A. PROPERLY EXECUTED MORTGAGE/DEED OF TRUST FROM A. PAIGE ATTAWAY AND SPOUSE, IF ANY, TO CITICORP TRUST BANK, FSB

2. PROPERLY DRAFTED AND EXECUTED OWNER'S AFFIDAVIT SIGNED BY BORROWERS.

3. PAYOFF AND RELEASE OR SUBORDINATION OF ALL LIENS SHOWN UNDER SCHEDULE B, SECTION II OF THIS COMMITMENT TO INSURE.

4. IF THIS IS A PURCHASE TRANSACTION AND THE BORROWER(S) ARE NOT PURCHASING AN OWNER'S POLICY, A STATEMENT SIGNED AT CLOSING THAT THEY DO NOT WANT TO PURCHASE AN OWNER'S POLICY OF TITLE INSURANCE MUST BE RETURNED TO LANDAMERICA ONESTOP.

5. IF PROCEEDS ARE BEING USED TO PAYOFF A SECURED REVOLVING OR CREDIT LINE ACCOUNT, ONE OF THE FOLLOWING REQUIREMENTS MUST BE MET: A) RELEASE OR SATISFACTION (COPY TO LANDAMERICA ONESTOP) OR B) PAYOFF LETTER FROM EXISTING LENDER VERIFYING BALANCE ALONG WITH YOUR DISCLOSURE AND EXECUTED NOTICE FROM THE BORROWERS TO THE LENDER STATING THAT THEY ARE TERMINATING THEIR RIGHTS TO ACCEPT ANY FUTURE ADVANCES.

6. VERIFICATION THAT ALL REAL ESTATE TAXES AND WATER AND SEWAGE TAXES, IF ANY, ARE PAID CURRENT.

# LandAmerica®
# Lawyers Title

## TITLE COMMITMENT

PHONE: (866) 226-8616
FAX: (866) 296-0095

| Order No.: 2654792VT | Search Fee: $ 230.00 |
| --- | --- |
| **Customer Information**<br>ANDREA ATTAWAY and MARC W ATTAWAY<br>299 PR 1088<br>FOUKE AR 71837<br>County: MILLER | **Client Information**<br>CITICORP TRUST BANK, FSB<br>Attn: MICHAEL SWANZY<br>Loan No: [redacted]2368<br>Title Insurance Premium: $386.78 |

**Effective Date: 02/14/2008** **Search Date: 02/25/2008**

THIS COMMITMENT IS SUBJECT TO AND INCORPORATES BY REFERENCE THE TERMS, CONDITIONS, STIPULATIONS AND EXCLUSIONS FROM COVERAGE CURRENTLY EXPRESSED IN THE STANDARD COMMITMENT FOR TITLE INSURANCE ISSUED BY LAWYERS TITLE INSURANCE CORPORATION.

### SCHEDULE B -- SECTION II

THE FOLLOWING ITEMS WILL APPEAR AS EXCEPTIONS ON TITLE INSURANCE POLICY, UNLESS THE SAME ARE DISPOSED OF TO THE SATISFACTION OF LANDAMERICA ONESTOP.

1. DEFECTS, LIENS, ENCUMBRANCES, ADVERSE CLAIMS OR OTHER MATTERS, IF ANY, CREATED, FIRST APPEARING THE PUBLIC RECORDS OR ATTACHING SUBSEQUENT TO THE EFFECTIVE DATE HEREOF, BUT PRIOR TO THE DATE THE PROPOSED INSURED ACQUIRED FOR VALUE OF RECORD THE ESTATE OR INTEREST OR MORTGAGE THEREON COVERED BY THIS COMMITMENT.

2. RIGHTS OR CLAIMS OF PARTIES IN POSSESSION NOT SHOWN BY THE PUBLIC RECORDS.

3. EASEMENTS OR CLAIMS OF EASEMENTS NOT SHOWN BY THE PUBLIC RECORDS.

4. ENCROACHMENTS, OVERLAPS, BOUNDARY LINE DISPUTES, OR OTHER MATTERS WHICH WOULD BE DISCLOSED BY AN ACCURATE SURVEY OR INSPECTION OF THE PREMISES.

5. ANY LIEN, OR RIGHT TO A LIEN, FOR SERVICES, LABOR OR MATERIAL HERETO OR HEREAFTER FURNISHED, IMPOSED BY LAW AND NOT SHOWN BY THE PUBLIC RECORDS.

6. RIGHTS OF DOWER, HOMESTEAD OR OTHER MARITAL RIGHTS OF THE SPOUSE, IF ANY, OF ANY INDIVIDUAL INSURED.

7. THOSE TAXES, SPECIAL ASSESSMENTS AND OTHER GOVERNMENTAL LIENS WHICH BECOME DUE AND PAYABLE SUBSEQUENT TO DATE OF POLICY.

8. COVENANTS, CONDITIONS AND RESTRICTIONS, IF ANY, APPEARING IN PUBLIC RECORDS, INCLUDING ANY COVENANTS, CONDITIONS OR RESTRICTIONS WHICH MAY (i) ESTABLISH AN EASEMENT ON THE LAND; (ii) PROVIDED A LIEN FOR LIQUIDATED DAMAGES; (iii) PROVIDE FOR A PRIVATE CHARGE OR ASSESSMENT; OR (iv) PROVIDE FOR AN OPTION TO PURCHASE, A RIGHT OF FIRST REFUSAL OR THE PRIOR APPROVAL OF A FUTURE PURCHASER OR OCCUPANT.

9. ANY EASEMENTS OR SERVITUDES APPEARING IN PUBLIC RECORDS.

10. ANY LEASE, GRANT, EXCEPTION OR RESERVATION OF MINERALS OR MINERAL RIGHTS APPEARING IN THE PUBLIC RECORDS.

11. ANY VIOLATIONS OR ENCROACHMENTS OF EXISTING IMPROVEMENTS LOCATED ON THE LAND ONTO ANY EASEMENTS OR UNTO ADJOINING LAND THAT ARE DISCLOSED BY THE SURVEY PRESENTED TO AND RELIED UPON BY THE COMPANY IN THE ISSUANCE OF THIS POLICY.

# LandAmerica®
# Lawyers Title

## TITLE COMMITMENT

PHONE: (866) 226-8616
FAX: (866) 296-0095

| Order No.: 2654792VT | Search Fee: $ 230.00 |
|---|---|
| Customer Information<br>ANDREA ATTAWAY and MARC W ATTAWAY<br>299 PR 1088<br>FOUKE AR 71837<br>County: MILLER | Client Information<br>CITICORP TRUST BANK, FSB<br>Attn: MICHAEL SWANZY<br>Loan No: [redacted]0368<br>Title Insurance Premium: $306.78 |

**Effective Date: 02/14/2008** **Search Date: 02/25/2008**

THIS COMMITMENT IS SUBJECT TO AND INCORPORATES BY REFERENCE THE TERMS, CONDITIONS, STIPULATIONS AND EXCLUSIONS FROM COVERAGE CURRENTLY EXPRESSED IN THE STANDARD COMMITMENT FOR TITLE INSURANCE ISSUED BY LAWYERS TITLE INSURANCE CORPORATION.

12. TAXES:

Tax ID: 4344-01
Tax Year: 2006 Tax Type: REAL ESTATE
Status: PAID Amount: $626.64

Homestead Exempt: YES, IN THE AMOUNT OF 300.00

Tax ID: 4344.00
Tax Year: 2006 Tax Type: REAL ESTATE
Status: PAID Amount: $56.73

Homestead Exempt:

Tax ID: 0398689
Tax Year: 2006 Tax Type: PERSONAL
Status: PAID Amount: $181.22

Homestead Exempt:

13. MORTGAGES/DEED OF TRUST:

Mortgagee: M.E.R.S., INC., ACTING SOLELY AS A NOMINEE FOR WR STARKEY MORTGAGE, L.L.P.
Mortgagor: ANDREA PAIGE ATTAWAY AND MARC W. ATTAWAY
Dated Date: 12/22/2003 Recorded Date: 12/30/2003
Amount: $148,500.00 Book/Page: 2003/26668
Open Ended: Instrument #: N/A
Maturity Date: 1/1/2034
Add'l Info: MORTGAGE ASSIGNMENT RERECORDED 1/20/2004 IN BOOK 2004 AT PAGE 969

14. JUDGMENTS:

NONE OF RECORD.

15. **OTHER:**

*The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance. Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the State Board of Insurance

GAP COVERAGE WILL BE PROVIDED WITH ISSUANCE OF FINAL POLICY.

THIS COMMITMENT VOIDS AND REPLACES ANY PREVIOUS COMMITMENT TRANSMITTED BY LANDAMERICA ONESTOP.
END OF COMMITMENT. THANK YOU FOR CHOOSING THE PROFESSIONALS AT LANDAMERICA ONESTOP.

ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08SD02 : 18 Pages

2008 5107
Recorded in the Above
Mortgage Book & Page
03-18-2008 10:46:22 AM
Mary Pankey-Circuit Clerk
Miller County, AR

Recordings Requested by &
When Recorded Return To:
US Recordings, Inc.
2925 Country Drive Ste 201
St. Paul, MN 55117

Prepared By:
Citicorp Trust Bank, fsb
4000 Regent Blvd, 3rd Floor
Mail Stop N3B-340
Irving, TX 75063

44120443

[Space Above This Line For Recording Data]

# MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 03, 2008 , together with all Riders to this document.
(B) "Borrower" is ANDREA ATTAWAY, Aka A PAIGE ATTAWAY and MARC W. ATTAWAY, Husband and Wife

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is Citicorp Trust Bank, fsb

Lender is a Federal Savings Bank
organized and existing under the laws of Delaware
Lender's address is 4500 Linden Hill Drive, Wilmington, DE 19808

Lender is the mortgagee under this Security Instrument.

002005102368
ARKANSAS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3004 1/01
Wolters Kluwer Financial Services
VMP ®-6(AR) (0811)
Page 1 of 15 Initials: AA MWA

CitiMortgage 3.2.13.21 V1

EXHIBIT 2

2008 5108
Mortgage Book & Page

(D) "Note" means the promissory note signed by Borrower and dated March 03, 2008. The Note states that Borrower owes Lender One Hundred Eighty Four Thousand Seven Hundred Seventy Four & 86/100 Dollars (U.S. $ 184,774.86 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than March 07, 2038.
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [ ] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] Schedule "A" |

- TIMELY PAYMENT REWARDS RIDER

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

2008 5109
Mortgage Book & Page

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to Lender the following described property located in the County of Miller :

[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

The Assessor's Parcel Number (Property Tax ID#) for the Real Property is 434401.
See Exhibit A

Parcel ID Number: 434401 which currently has the address of
299 PR 1088 [Street]
Fouke [City], Arkansas 71837- [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

2008 5110
Mortgage Book & Page

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

2008 5113
Mortgage Book & Page

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

2008 5116
Mortgage Book & Page

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

2008 5117
Mortgage Book & Page

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**It is understood and agreed to by Borrower that this Security Instrument is subject to the foreclosure procedures of the Arkansas Statutory Foreclosure Law, Act 53 of 1987, as amended from time to time (the "Act"), for Borrower's breach of any covenant or agreement in this Security Instrument. In furtherance and not in limitation of the provisions of Section 12, any forbearance by Lender in exercising any right or remedy under the Act shall not be a waiver of or preclude acceleration and the exercise of any right or remedy under the Act, or at the option of Lender, use of judicial foreclosure proceedings.**

**23. Release.** Upon payment in full of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

2008 5120
Mortgage Book & Page

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

Shelia Reed

Andrea Attaway (Seal)
ANDREA ATTAWAY AKA A/Paige Attaway -Borrower

Marc W. Attaway (Seal)
MARC W. ATTAWAY -Borrower
(Sign Original Only)

002005102368
VMP®-6(AR) (0511)

Form 3004 1/01
CitiMortgage 3.2.13.21 V1

2008 5121
Mortgage Book & Page

STATE OF ARKANSAS, Miller County ss:

On this the 3rd day of March 2008, before me, the undersigned officer, personally appeared

Andrea Attaway* & Marc W. Attaway
* AKA A. Paige Attaway

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she (they) executed the same for the purposes and consideration therein contained.

In witness whereof I hereunto set my hand and official seal.

My Commission Expires: 2/23/10

"OFFICIAL SEAL"
SHELIA REED
Notary Public, State of Arkansas
County of Miller
My Commission Expires 02/23/2010

Shelia Reed
Notary Public
Shelia Reed

Lien Holder: CitiMortgage, Inc.

Address: P.O. Box 790017 St. Louis, MO 63179-0017

Telephone Number: 1-800-283-7918

Contact Chris Skarzinski, Vice President - Customer Service or Successor

for release of lien.

002005102368
VMP®-6(AR) (0611)

Page 15 of 15

Initials: AA MA

Form 3004 1/01
CitiMortgage 3.2.13.21 V1

2008 5122
Mortgage Book & Page

# TIMELY PAYMENT REWARDS RIDER

THIS TIMELY PAYMENT REWARDS RIDER is made this 3rd day of March, 2008, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note to Citicorp Trust Bank, fsb ("Lender") covering the Property described in the Security Instrument and located at:

289 PR 1089 Fouke, AR 71837-
[Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. TIMELY PAYMENT REWARDS RATE REDUCTION
The Note provides for the reduction in Borrower's interest rate as follows:

1. TIMELY PAYMENT REWARDS RATE REDUCTION
Borrower has agreed to pay the rate of interest set forth in Section 2 of the Note (the "Note Rate") until the full amount of principal has been paid. However, if on any one of the second, third, or fourth anniversaries of the scheduled due date of the first full installment payment due under the Note (each, an "Anniversary Date") Borrower has demonstrated a Good Payment History, Lender agrees to decrease the Note Rate by zero & 50/100 percentage point (.5 %). Borrower will be deemed to have demonstrated a "Good Payment History" if Borrower: (a) has made each of the most recent 24 consecutive monthly payments under the Note and Security Instrument before the date the next payment was due: and (b) has never been late by 3 months or more in making any monthly payments due under the Note. If Borrower demonstrates a Good Payment History, the new Note Rate will take effect on the earliest Anniversary Date on which Borrower has demonstrated a Good Payment History ("Rate Reduction Date"). Beginning with Borrower's first monthly payment after the Rate Reduction Date, Borrower will pay the new amount as the monthly payment until the Maturity Date. Lender will decrease Borrower's Note Rate only one time during the term of the loan, provided Borrower demonstrates a Good Payment History on any one of the second, third, or fourth Anniversary Dates.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Timely Payment Rewards Rider.

[signature] (Seal)
ANDREA ATTAWAY -Borrower

[signature] (Seal)
MARC W. ATTAWAY -Borrower
(Sign Original Only)

GF400075 (01/01) Application No. 002005102368 Account No. 2002387930

## LEGAL DESCRIPTION

THE FOLLOWING LAND LYING IN MILLER COUNTY, ARKANSAS:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND BEING ALL OF THE SOUTHEAST QUARTER (SE 1/4) OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION TWENTY (20), TOWNSHIP SIXTEEN (16) SOUTH, RANGE TWENTY-SIX (26) WEST, MILLER COUNTY, ARKANSAS AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS;

BEGINNING: AT A FOUND 5/8" REBAR FOR CORNER AT THE SOUTHEAST CORNER OF SECTION 20, T16-S, R-26-W, MILLER COUNTY, ARKANSAS;

THENCE: N 01° 21' 00" E, WITH THE EAST BOUNDARY LINE OF THE SE 1/4 OF SAID SECTION 20, 1372.72 FEET TO A FOUND 1" IRON PIPE FOR CORNER;

THENCE: N 87° 55' 40" W, WITH THE NORTH BOUNDARY LINE OF THE SE 1/4 OF THE SE 1/4 OF SAID SECTION 20, 1316.15 FEET TO A FOUND 1 1/2" IRON PIPE FOR CORNER;

THENCE: S 01° 23' 12" W, WITH THE WEST BOUNDARY LINE OF THE SE 1/4 OF THE SE 1/4 OF SAID SECTION 20 1323.30 FEET TO A FOUND 1" IRON PIPE FOR CORNER AT AN EXISTING FENCE CORNER;

THENCE: S 87° 44' 09" E, ALONG AN EXISTING FENCE LINE, 1317.06 FEET TO THE POINT OF BEGINNING, CONTAINING 40.0595 ACRES OF LAND, MORE OR LESS;

SAVE AND EXCEPT THE FOLLOWING TRACT OF LAND:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND BEING PART OF THE SOUTHEAST QUARTER (SE 1/4) OF THE SOUTHEAST QUARTER (SE 1/4) OF SECTION TWENTY (20), TOWNSHIP SIXTEEN (16) SOUTH, RANGE TWENTY-SIX (26) WEST, MILLER COUNTY, ARKANSAS AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS;

COMMENCING: AT A FOUND 3/4" REBAR FOR CORNER AT THE SOUTHEAST CORNER OF THE SE 1/4 OF SECTION 20, T-16-S, R-26-W, MILLER COUNTY, ARKANSAS;

THENCE: N 87° 44' 09" W, WITH THE SOUTH BOUNDARY LINE OF THE SE 1/4 OF SAID SECTION 20, 502.38 FEET TO A SET 5/8" REBAR FOR CORNER AND BEING THE POINT OF BEGINNING FOR THE HEREIN DESCRIBED TRACT OF LAND;

THENCE: N 87° 44' 09" W, WITH THE SOUTH BOUNDARY LINE OF THE SE 1/4 OF SAID SECTION 20, 814.68 FEET TO A FOUND 1" IRON PIPE FOR CORNER;

THENCE: N 01° 23' 13" E, WITH THE WEST BOUNDARY LINE OF THE SE 1/4 OF THE SE 1/4 OF SAID SECTION 20, 534.75 FEET TO SET 5/8" REBAR FOR CORNER IN THE CENTERLINE OF A COUNTY ROAD;

THENCE: S 87° 44' 09" E, 814.68 FEET TO A SET 5/8" REBAR FOR CORNER;

Go to pg 2 2654792vt

THENCE: S 01° 23' 13" W, 534.75 FEET TO THE POINT OF BEGINNING, CONTAINING 10.0000 ACRES OF LAND, MORE OR LESS.

TAX ID #: 4344-01; 4344-00

BEING ALL AND THE SAME LANDS AND PREMISES CONVEYED TO A. PAIGE ATTAWAY BY JASON CHARLES TEMPLE AND DIANE TEMPLE IN A WARRANTY DEED EXECUTED 11/5/2004 AND RECORDED 11/9/2004 IN BOOK 2004, PAGE 6471 OF THE MILLER COUNTY, ARKANSAS LAND RECORDS

2654792vt

U44120443-010P18
MORTGAGE
US Recordings

SEAL OF CIRCUIT COURT
MILLER CO., ARKANSAS

Miller County, AR
I certify this instrument was filed on
03-18-2008 10:46:22 AM
and recorded in Mortgage Book
2008 at pages 5107 - 5124
Mary Pankey-Circuit Clerk



2013R008520
MILLER COUNTY CIRCUIT CLERK
TEXARKANA, AR
RECORDED ON
09/11/2013 09:25:45AM
REC FEE: 15.00
PAGES: 1

7- 52797

PREPARED BY & RETURN TO:
M. E. Wileman

2860 Exchange Blvd. # 100
Southlake, TX 76092

## Assignment of Mortgage

Send Any Notices To Assignee.

For Valuable Consideration, the undersigned, **CITIBANK N.A, SUCCESSOR IN INTEREST BY MERGER TO CITICORP TRUST BANK, FSB 4050 REGENT BLVD, MS N2A-222, IRVING, TX 75063** (Assignor) by these presents does assign and set over, without recourse, to **CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE OF NORMANDY MORTGAGE LOAN TRUST, SERIES 2013-8** 1610 E. St. Andrew Place, Suite B, Santa Ana, CA 92705 (Assignee) the described mortgage with all interest, all liens, any rights due or to become due thereon, executed by **ANDREA ATTAWAY AKA A PAIGE ATTAWAY AND MARC W ATTAWAY, HUSBAND AND WIFE** to **CITICORP TRUST BANK, FSB.** Said mortgage Dated: 3/3/2008 is recorded in the State of AR, County of Miller on 3/18/2008, Book 2008 Page 5107 AMOUNT: $ 184,774.86 Property Address: 299 PR 1088, FOUKE, AR 71837

IN WITNESS WHEREOF, the undersigned corporation has caused this instrument to be executed as a sealed instrument by its proper officer. Executed on: 8/27/13

CITIBANK N.A, SUCCESSOR IN INTEREST BY MERGER TO CITICORP TRUST BANK, FSB

By: ______________________
Jason LaRocca, Assistant Vice President

ATTAWAY YNS *13055198*

State of Maryland, County of Washington

On 8/27/13, before me, the undersigned, Jason LaRocca, who acknowledged that he/she is Assistant Vice President of for CITIBANK N.A, SUCCESSOR IN INTEREST BY MERGER TO CITICORP TRUST BANK, FSB and that he/she executed the foregoing instrument and that such execution was done as the free act and deed of CITIBANK N.A, SUCCESSOR IN INTEREST BY MERGER TO CITICORP TRUST BANK, FSB. GIVEN UNDER MY HAND AND SEAL OF OFFICE this 8/27/13.

KATHY E. GREEN FREDERICK COUNTY MARYLAND NOTARY PUBLIC
Kathy E. Green, Notary Public
Frederick County
State of Maryland
My Commission Expires Nov 15 2013

______________________
Notary public, Kathy E. Green
My Commission Expires: 11/15/13

AR Miller CITICAP/WL18-2013/AS

**EXHIBIT 3**

eRecorded
2015R004572
MARY PANKEY
MILLER COUNTY CIRCUIT CLERK
TEXARKANA, AR
RECORDED ON
06/03/2015 10:08:02 AM
REC FEE: $35.00

PAGES: 2

ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08D02 : 12 Pages

PREPARED BY & RETURN TO:
Document Recording Services
PO Box 3008
Tallahassee, FL 32315

Record 1st

# Assignment of Mortgage

Send Any Notices To Assignee.

LN: 260118

For Valuable Consideration, the undersigned, **CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE FOR NORMANDY MORTGAGE LOAN TRUST, SERIES 2013-8 500 Delaware Avenue, 11th Floor, Wilmington, DE 19801 (Assignor)** by these presents does assign and set over, without recourse, to **NORMANDY MORTGAGE ACQUISITION COMPANY, LLC c/o The Palisades Group LLC, 11755 Wilshire Blvd, Suite 1700, Los Angeles, CA 90025 (Assignee)** the described mortgage with all interest, all liens, any rights due or to become due thereon, executed by **ANDREA ATTAWAY, AKA A PAIGE ATTAWAY AND MARC W ATTAWAY, HUSBAND AND WIFE** to **CITICORP TRUST BANK, FSB.** Said mortgage **Dated: 3/3/2008** is recorded in the State of **AR**, County of **Miller** on **3/18/2008, Book 2008 Page 5107 AMOUNT: $ 184,774.86** Property Address: **299 PR 1088, FOUKE, AR 71837**

**IN WITNESS WHEREOF**, the undersigned corporation has caused this instrument to be executed as a sealed instrument by its proper officer.
Executed on: 4/10/15

CHRISTIANA TRUST, A DIVISION OF WILMINGTON SAVINGS FUND SOCIETY, FSB, AS TRUSTEE FOR NORMANDY MORTGAGE LOAN TRUST, SERIES 2013-8

ATTAWAY CNR *15025403*

By: ~~The Palisades Group, LLC,~~ Its Appointed Attorney in Fact
NORMANDY MORTGAGE ACQUISITION COMPANY II, LLC

By: Troy Grande, Authorized Signatory
TG

POA recorded 5/6/2015 #2015R0003810

AR Miller

C209040437
PAL/14-4GEM/ASN1ST

EXHIBIT 4

PREPARED BY & RETURN TO:
Document Recording Services
PO Box 3008
Tallahassee, FL 32315

**Assignment of Mortgage**

Send Any Notices To Assignee.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles
On 4/10/15 before me, Gabriella S. Loughnot, Notary Public, personally appeared Troy Grande, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity(ies), and that by his/~~her/their~~ signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Gabriella S. Loughnot
Notary public, Gabriella S. Loughnot
My commission expires: July 21, 2017

GABRIELLA S. LOUGHNOT
COMM. #2034242
Notary Public - California
Los Angeles County
My Comm. Expires July 21, 2017

*15025403*

AR Miller

C209040437
PAL/14-4GEM/ASN1ST

eRecorded
2015R004578
MARY PANKEY
MILLER COUNTY CIRCUIT CLERK
TEXARKANA, AR
RECORDED ON
06/03/2015 10:08:02 AM
REC FEE: $20.00

PAGES: 2

ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08SD02 : 2 Pages

PREPARED BY & RETURN TO:
Document Recording Services
PO Box 3008
Tallahassee, FL 32315
LN: 240118

RECORD 2nd

# Assignment of Mortgage

Send Any Notices To Assignee.

For Valuable Consideration, the undersigned, NORMANDY MORTGAGE ACQUISITION COMPANY, LLC c/o The Palisades Group LLC, 11755 Wilshire Blvd, Suite 1700, Los Angeles, CA 90025 (Assignor) by these presents does assign and set over, without recourse, to US BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE PRP II PALS INVESTMENTS TRUST 7144 E Stetson Dr, Suite 410, Scottsdale, AZ 85251 (Assignee) the described mortgage with all interest, all liens, any rights due or to become due thereon, executed by ANDREA ATTAWAY, AKA A PAIGE ATTAWAY AND MARC W ATTAWAY, HUSBAND AND WIFE to CITICORP TRUST BANK, FSB. Said mortgage Dated: 3/3/2008 is recorded in the State of AR, County of Miller on 3/18/2008, Book 2008 Page 5107
AMOUNT: $ 184,774.86 Property Address: 299 PR 1088, FOUKE, AR 71837

IN WITNESS WHEREOF, the undersigned corporation has caused this instrument to be executed as a sealed instrument by its proper officer.

Executed on: 5-1-15

NORMANDY MORTGAGE ACQUISITION COMPANY, LLC

ATTAWAY OFG1 *15029237*

By: Troy Gronde, Authorized Signatory

AR Miller

C209040437
PAL/14-4GEM/ASN2ND

EXHIBIT 5

PREPARED BY & RETURN TO:
Document Recording Services
PO Box 3008
Tallahassee, FL 32315

**Assignment of Mortgage**

Send Any Notices To Assignee.

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

State of California
County of Los Angeles
On 5-1-15 before me, G. H. Rodriguez, Notary Public, personally appeared Troy Grande, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Notary public, G. H. Rodriguez
My commission expires: March 8, 2019

G. H. RODRIGUEZ
Commission # 2102484
Notary Public - California
Los Angeles County
My Comm. Expires Mar 8, 2019

*15029237*

AR Miller

C209040437
PAL/14-4GEM/ASN2ND



ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08SD02 : 3 Pages

DUNHAM
HILDEBRAND PLLC

LITIGATION · INSOLVENCY · REAL ESTATE

Griffin Dunham
615.933.5850
griffin@dhnashville.com

Ned Hildebrand
615.933.5851
ned@dhnashville.com

April 20, 2016

**VIA CERTIFIED MAIL**

Fidelity National Title Group
Successor to LandAmerica Lawyers Title
Attn: New Claims
P.O. Box 45023
Jacksonville, FL 32232

Re: LandAmerica Lawyers Title
Commitment No. 2654792VT
299 PR 1088, Fouke, Arkansas 71837

Dear Claims Department:

This law firm has been retained by US Bank Trust National Association, as Trustee of the PRP II PALS Investments Trust ("PRP"), the holder of the above-referenced title policy. By assignment, PRP is the current holder of the note and mortgage that was to encumber the property in question described above, 299 PR 1088, Fouke, Arkansas (the "Property").

PRP learned after the assignment that the mortgage does not describe the Property, which is developed property containing the principal residence of the borrowers, Andrea Paige Attaway and Marc Attaway. The property that is described in the mortgage is the adjoining 30-acre parcel of raw land. The value of the Property exceeds the $184,774.86 note that is secured by the mortgage. The value of the adjoining raw land is $30,000. Because the Title Commitment describes the raw land and not the Property, PRP has been damaged in that the note secured by the mortgage is not fully secured. PRP is entitled to relief under the title policy.

**Background Facts**

The Miller County Tax Assessor lists the 10-acre Property with parcel number 00434401 while the 30-acre undeveloped parcel has parcel number 00434400. The Attaways acquired the Property by Warranty Deed recorded December 27, 2003 in Book 2003, Page 6434. A Mortgage securing a note in the amount of $148,500 was recorded in Mortgage Book 2003, Page 26668 and again in Mortgage Book 2004, Page 969. That 2003 Mortgage described the Property.

Ms. Attaway acquired the raw land by Warranty Deed recorded almost a year later on November 9, 2004 in Book 2004, 6471.

**EXHIBIT 6**

The Attaways sought to refinance the 2003 Mortgage through Citicorp Trust Bank, FSB, PRP's predecessor. The loan-origination documents and the Settlement Statement demonstrate that the Attaways and Citicorp did so intend to pay off the 2003 Mortgage, with the note signed by the Attaways in favor of Citicorp to be secured by the Mortgage that was recorded in Mortgage Book 2008, Page 5107. The 2008 Mortgage was to encumber the Property and not the raw land.

**The Title Commitment Was in Error**

The Title Commitment lists both parcels in its search for taxes paid, along with a Homestead Exemption. More to the point, however, the Title Commitment lists both parcels in the legal description, before saving and excepting from title insurance coverage the residential property. As importantly, the property to be insured as shown to be the same property as was conveyed to Ms. Attaway in 2004 for the vacant property. The Title Commitment was prepared incorrectly in that, the carve out provided for in the legal description that was prepared following the title search carved out the residential property when the vacant land should have been excepted from coverage.

The 2008 Mortgage also attaches the legal description that was prepared for and used in the Title Commitment, saving and excepting from encumbrance the residential property, and, referencing the vesting deed as being that Warranty Deed conveying the vacant land. Both the Title Commitment and the 2008 Mortgage fail to follow the legal description for the 2003 Mortgage, the mortgage that was to be paid in full and replaced by the 2008 Mortgage.

Enclosed for your information are the following:

1. The 2003 Mortgage;

2. The 2004 Warranty Deed for the vacant land;

3. The 2008 Mortgage;

4. The Promissory Note secured by the 2008 Mortgage;

5. The Title Commitment at issue;

6. Relevant Loan-Origination Documents;

7. HUD-1 Settlement statement providing for payoff of 2003 Mortgage;

8. Underwriting Worksheet;

9. Assignment of the 2008 Mortgage to PRP (Two Assignments).

Because of the error contained in the Title Commitment, PRP has been damaged in an amount in excess of $150,000.00, represented by the loss in secured value to PRP, as this error caused the incorrect legal description attached to the 2008 Mortgage. Based upon this proof, PRP demands through this letter that Fidelity National Title Group, or its corporate affiliates, make PRP whole.

We look forward to your prompt response. If you need further assistance with the resolution of this matter, please do not hesitate to contact this office.

Respectfully,

Henry E. ("Ned") Hildebrand, IV

ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08SD02 : 2 Pages

**Fidelity National Title**
**Insurance Company**

August 5, 2016

**VIA EMAIL**
Mr. Henry E. Hildebrand, IV
Dunham Hildebrand
*ned@dhnashville.com*

Re: Claim No.: 547729
Policy No.: 2654792VT
Insured: Citicorp Trust Bank, FSB
Claimant: US Bank Trust National Association as Trustee of the PRP II PALS Investments Trust
Borrower: A. Paige Attaway

Dear Mr. Hildebrand:

As you might know, this matter has been transferred to me for further administration. On behalf of Claimant, you previously submitted a claim to the Company based on an alleged legal description defect. On June 10, 2016, the Company sent the enclosed response letter (the "June 10th Letter") in which it respectfully denied coverage. Via letter dated June 29th you requested that the Company reconsider its position on the matter ("Request for Reconsideration"). For the reasons stated herein, coverage for your claim is accepted, subject to the terms and conditions of the Policy. The capitalized terms used but not defined herein shall have the meanings ascribed to them in the June 10th Letter.

By way of background, your original claim letter alleged that the Insured Mortgage should have encumbered a 10 Acre Tract of improved land owned by the Borrowers, not the adjacent 30 Acre tract of raw land, also owned by the Borrowers ("Legal Description Issue"). The Company hereby accepts coverage for the Legal Description Issue.

In your Request for Reconsideration you also brought up a potential issue with access (the "Access Issue"). After review of the information available to me, it appears there is an access issue with respect to the 10 Acre Tract. Said tract is accessed via *Private* Road 1088. To that end, there does not appear to be access between the 10 Acre Tract and a public road, and therefore the Access Issue triggers coverage under the Policy. The Company will continue its investigation in order to determine the best course of action in order to establish access and to correct the legal description. I will update you as I make progress in this regard. Please note, however, that the Borrower is in active Bankruptcy. To that end, it is possible that the Company might not be able to take curative action at this time.

**EXHIBIT 7**

Please note that the Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title, as insured, or to prevent or reduce loss or damage to the Insured.

Please be advised that the Company may continue its independent investigation of this matter and maintains the right to assert any defense, including a defense which is not apparent at this time and becomes apparent during the course of its continuing investigation of the above-referenced claim. The Company maintains any and all rights and defenses that it has under the Policy or under any applicable legal theory or principle.

Please note that additional terms and conditions of the Policy may be applicable to this claim. Reference to any particular provision of the Policy in this letter, therefore, shall not be construed as a waiver of any other tem or provision. The Company retains the right to supplement this letter.

If you have any questions or concerns, please do not hesitate to reach out to me. I can be reached at Andrea.Price@fnf.com or (904) 854-8110.

Sincerely,

Andrea K. Price, Esq.
Senior Claims Counsel / Vice President

Enclosures

ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08SD02 : 3 Pages

**Fidelity National Title**
Insurance Company

June 1, 2017

*VIA MAIL AND EMAIL*

Dunham Hildebrand, PLLC
Attn: Henry E. Hildebrand, IV
1704 Charlotte Avenue, Suite 105
Nashville, Tennessee 37203
Ned@dhnashville.com

| RE | Claim No.: | 547729 |
|---|---|---|
| | Policy No.: | 2652792VT |
| | Named Insured: | Citicorp Trust Bank, FSB |
| | Property: | 229 PR 108, Fouke, Arkansas 71837 |

Dear Mr. Hildebrand:

By letter dated April 25, 2016, you submitted the above-referenced claim to Fidelity National Title Insurance Company, as successor in interest to Lawyers Title Insurance Corporation (the "Company"), on behalf of the Claimant. The Company denied coverage for the claim pursuant to the letter to you, from the Company dated June 10, 2016 (the "Coverage Letter"). Subsequently, upon reconsideration, the Company accepted coverage for the claim, subject to the terms and conditions of the policy, pursuant to the letter dated August 5, 2016 ("Reconsideration Response"). The facts and defined terms set forth in the Coverage Letter and Reconsideration Response are incorporated herein. The Company hereby provides this supplemental coverage determination based upon recently discovered information. The Company has determined that liability for this matter has terminated and thus this claim is respectfully denied.

Upon further investigation and pursuant to the Order issued by Honorable Richard D. Taylor dated April 27, 2017, on October 12, 2012, Andrea Paige Attaway (the "Debtor-Borrower") filed her Chapter 13 Voluntary Petition. Debtor-Borrower listed the Insured Mortgage in schedule D on the 30 Acre Tract. The Debtor-Borrower listed the 10 Acre Tract as exempt and unencumbered by any lien or mortgage. On November 19, 2012, CitiMortgage, then holder of the Insured Mortgage, filed proof of claim. Subsequently, the Court confirmed the plan, providing for the surrender of the 30 Acre Tract and no payments to the holder of the Insured Mortgage. Pursuant to 11 U.S.C. § 1327(a), *the provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provide for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.* CitiMortgage received its last payment from the Borrowers on July 17, 2012. On March 18, 2013, an amendment of the plan was filed. The amended plan was confirmed by the Court on April 17, 2013.

**EXHIBIT 8**

The Company's position as stated in its Coverage Letter and Reconsideration Response did not waive, invalidate, forfeit, or modify any of the Company's rights under the Policy. The Company specifically reserved its rights pursuant to paragraph 3 of the Policy's Conditions:

*CONDITIONS*

*3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT*

*The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title.* ***If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.***

The Company would further like to direction your attention to paragraph 1(e), which states in relevant part:

*(e) "Insured": The Insured named in Schedule A.*
*(i) the term "Insured" also includes*
*(A) The owner of Indebtedness and each successor in ownership of the Indebtedness...*
*(ii) With regard to (A), (B), (C), (D), and (E)* ***reserving, however all rights and defenses as to any successor that the Company would have had against any predecessor Insured...***

The Company's reservation of rights was predicated on the above-cited Policy provisions, as the failure to provide timely notice of the bankruptcy plan in the pending bankruptcy prejudiced the Company's opportunity to object to the proposed plan and seek reformation of the Insured Mortgage prior to the Court Order confirming the plan.

As noted in the Order, the Claimant nor its predecessors initiated a reformation proceeding or asserted its reformation claim prior to confirmation of the plan or amended plan despite the absence of payments prior to bankruptcy, full disclosure in the Debtor's bankruptcy schedules, and an opportunity to object to the plan and resolved in the matter in the bankruptcy court or a non-bankruptcy forum. Additionally, CitiMortgage received sufficient notice as it filed a proof of claim on November 12, 2012. The Company first became aware of the Bankruptcy and confirmed plan in or around June of 2016, pursuant to an email sent by you to the Company dated June 6, 2016.

As a result of the late notice, the Company was unable object to the bankruptcy plan to assert a reformation action. Had the Company been given prompt notice of this claim in November of 2012, when CitiMortgage received notice of the bankruptcy plan, the Company would have had the opportunity to present a quiet title action to reform the Insured Mortgage providing evidence that the Insured Mortgage was intended to encumber the 10 Acre Tract. Because notice of this

claim was not given to the Company until after the bankruptcy plan was confirmed the Company's ability to resolve this matter has been prejudiced.

Based on the foregoing, in accordance with the Company's rights as set forth in the Coverage Letter and Reconsideration Response, as supplemented herein, the Company withdraws its acceptance of coverage for this claim and denies that it has any liability with regard to this claim.

Please note that the above is based on the information currently available to the Company. The contents of this letter and the contents of any prior correspondence do not constitute, nor shall the same be construed as, a waiver of the terms and conditions of the Policy, any grounds for denial, or any applicable defenses as may be afforded by law. The Company retains the right to supplement this letter.

If there are any additional facts relevant to this matter, please provide this information or documentation as soon as possible. If I do not receive any additional information or documentation that you believe alters the above determination, the claim file will be closed in 30 days from the date of this letter.

Should you have any questions or concerns regarding this matter, I can be reached at the above address or at Holland.Hawkins@fnf.com. You may also call me directly at 904-701-6166. **Please reference the above claim number in all communications with my office.** Thank you.

Kind Regards,

Holland Hawkins
Claims Counsel, AVP



DUNHAM
HILDEBRAND PLLC
LITIGATION · INSOLVENCY · REAL ESTATE

Griffin Dunham
615.933.5850
griffin@dhnashville.com

Ned Hildebrand
615.933.5851
ned@dhnashville.com

ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08SD02 : 6 Pages

June 22, 2017

**VIA U.S. MAIL AND EMAIL**

Fidelity National Title Insurance Company
Successor to LandAmerica Lawyers Title
Attn: Holland Hawkins
Claims Department
601 Riverside Avenue, Building 5, 4th Floor
Jacksonville, FL 32204
E: holland.hawkins@fnf.com

Re: LandAmerica Lawyers Title
**Claim No. 547729**
Policy No. 2654792VT
Named Insured: Citicorp Trust Bank, FSB
Property: 299 PR 1088, Fouke, Arkansas 71837

Dear Ms. Hawkins:

This letter is in response to your letter dated June 1, 2017, in which Fidelity National Title Insurance Company ("Fidelity") denied coverage on the above-referenced title claim (the "Claim") with respect to the property identified above (the "Denial Letter"). The Claim was submitted by US Bank Trust National Association, as Trustee of the PRP II PALS Investments Trust ("PRP"). As you know, Fidelity previously accepted coverage of the Claim and hired a law firm to remedy the title defect. This law firm was not successful. Fidelity now takes the position that it does not have any obligation to cover this loss.

In the Denial Letter, Fidelity acknowledges that it once had an obligation to cover the issue, but that this obligation ceased when PRP's predecessor-in-interest, Citicorp Trust Bank, FSB ("Citi") failed to notify Fidelity of the title problem before Andrea Attaway, one of the owners of the property at issue, confirmed a chapter 13 bankruptcy plan with the United States Bankruptcy Court for the Eastern and Western Districts of Arkansas (the "Bankruptcy Court"). According to Fidelity, the failure of Citi to promptly notify Fidelity of the title issue prevented Fidelity from taking corrective action prior to confirmation of Ms. Attaway's plan. Because Fidelity allegedly suffered prejudice by this delay, Fidelity contends that it no longer must cover the loss.

This position is based on a false premise. As this letter explains, Citi lost its ability to cure the title defect *as soon as Ms. Attaway filed bankruptcy;* the failure to notify Fidelity or object to confirmation of Ms. Attaway's plan is wholly irrelevant. And Citi could not reasonably have discovered the title issue until Ms. Attaway filed her bankruptcy case. Thus, Fidelity was

**EXHIBIT 9**

not prejudiced by Citi's failure to disclose the title issue before confirmation of the Debtor's plan. Absent prejudice, Fidelity is obligated to cover the loss.

While PRP has set forth the material facts in prior correspondence, a short summary of the facts is helpful to understanding Fidelity's obligations here.

**Summary of Facts**

In 2003, Ms. Attaway (the "Debtor") and her husband, Marc Attaway, acquired a ten-acre parcel of real property located at 299 PR 1088, Fouke, Arkansas 71837, along with the improved structure existing thereon (the "Property") by Warranty Deed recorded December 27, 2003 in Book 2003, Page 6434 with the Miller County Register of Deeds. A mortgage securing a note in the amount of $148,500 was recorded in Mortgage Book 2003, Page 26668 and again in Mortgage Book 2004, Page 969 (the "2003 Mortgage"). That 2003 Mortgage described the Property.

In 2004, the Debtor acquired a thirty-acre tract of land adjacent to the Property (the "Vacant Land") pursuant to a warranty deed. This warranty deed was recorded on November 9, 2004 in Book 2004, Page 6471.

In 2008, the Debtor and her husband sought to refinance the 2003 Mortgage through a new mortgage (the "2008 Mortgage") executed in favor of Citi. Though the 2008 Mortgage was intended to encumber the Property by refinancing the 2003 Mortgage, the "metes and bounds" legal description mistakenly described the Vacant Land instead of the Property. This was the result of a scrivener's error and a mutual mistake of Citi and the Attaways at the time the 2008 Mortgage was signed.

As part of the closing of the 2008 Mortgage, Citi purchased the above-referenced policy (the "Policy"). The Policy specifically included Endorsement 7-06, which insured that the land covered by the Policy included an improved structure. Thus, the Policy specifically insured that the 2008 Mortgage covered the Property—not the Vacant Land.

On October 12, 2012, the Debtor filed chapter 13 bankruptcy with the Bankruptcy Court. In her voluntary petition, she listed the Property as unencumbered and the Vacant Lot as being encumbered by the 2008 Mortgage. Her plan was confirmed on April 17, 2013.

On April 20, 2016, PRP sent its demand for coverage under the Policy to Fidelity. On June 10, 2016, Fidelity sent a response denying coverage. PRP sent a demand for reconsideration, and on August 5, 2016, Fidelity agreed to cover the claim. Fidelity then waited nearly six months to take any action, finally filing a motion for relief from the automatic stay to allow PRP to reform the 2008 Mortgage in Arkansas state court to reflect the parties' true intentions (the "Stay Relief Motion"). On April 27, 2017, the Bankruptcy Court denied the Stay Relief Motion.

On June 1, 2017, Fidelity informed PRP that—despite previously accepting coverage—it now was denying coverage. Fidelity claims that it may reduce its liability under the Policy to the

extent it is prejudiced by the insured claimant. In this case, the Debtor's plan treated Citi as being secured only on the Vacant Lot. Citi did not object or otherwise notify Fidelity of the plan treatment before confirmation. Fidelity asserts that it was prejudiced by Citi's failure to provide notice of the issue before confirmation of the Debtor's plan. This, according to Fidelity, is the reason that reformation was impossible. Fidelity states,

> As a result of the late notice, the Company was unable to object to the bankruptcy plan to assert a reformation action. Had the Company been given prompt notice of this claim in November of 2012, when CitiMortgage received notice of the bankruptcy plan, the Company would have had the opportunity to present a quiet title action to reform the Insured Mortgage providing evidence that the Insured Mortgage was intended to encumber the 10 Acre Tract. Because notice of this claim was not given to the Company until after the bankruptcy plan was confirmed[,] the Company's ability to resolve this matter has been prejudiced.

This position fundamentally misunderstands the implications of a bankruptcy filing on a creditor's ability to reform a mortgage—and the timeline for when such action may be taken. As set forth in this correspondence, reformation must occur before the owner files bankruptcy, *not* before he or she confirms a chapter 13 plan.

**Discussion of Legal Issues**

Trustees in bankruptcy are afforded substantial rights in their capacity as estate administrators that take effect *immediately upon the filing of the bankruptcy case.* One such right is the Trustee's "strong-arm power" under 11 U.S.C. § 544(a)(3). This section of the Bankruptcy Code provides as follows:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> (3) A bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

This statute has enormous implications on a creditor's ability to resolve title issues in bankruptcy. When a bankruptcy case is filed, the Bankruptcy Code treats the filing as an implied sale of all the debtor's assets from the debtor to his or her bankruptcy estate. The trustee of the bankruptcy estate is then treated as a *bona fide purchaser* of these assets. Under Arkansas state law, reformation of a property's legal description may not be applied against a *bona fide purchaser* of the property. *First State Bank of Crossett v. Caine,* 2014 WL 1332055, at *4 (W.D. Ark. 2011); *see also In re May,* 310 B.R. 405, 420 (Bankr. E.D. Ark. 2004). Thus, if the debtor

files bankruptcy before the instrument is reformed, reformation is no longer possible against the debtor's estate. The trustee, as the "bona fide purchaser" may block any effort to reform the instrument.

This was made clear in *First State Bank of Crossett v. Caine*. In that case, the debtors had a mortgage with an incorrect legal description. Specifically, the calls in the metes and bounds description did not close. After the debtors filed bankruptcy, they attempted to use Section 544 to void the mortgagee's lien. *Caine,* 2014 WL 1332055 at *1.

At a hearing before the bankruptcy court (which is the same court where the Debtor's bankruptcy is pending), the mortgagee presented proof that (a) the mistaken legal description was a scrivener's error caused by mutual mistake and (b) the mistake was not known to either party at the time of execution of the loan documents, nor was it discovered until after the debtors filed bankruptcy. *Id.* The mortgagee also put on proof from a title examiner that (a) a search of the grantor/grantee index would have revealed the mortgage, and (b) "a cursory reading of the mortgage would have alerted a title examiner to the claimed mortgage lien of the [mortgagee] despite the erroneous land description." *Id.* Given these facts, the mortgagee argued that reformation against the trustee was appropriate. *Id.*

The bankruptcy court disagreed. It held that the erroneous legal description did not put a bona fide purchaser on notice of the asserted interest in the subject property because "it is impossible to tell exactly what land is being described." *Id.* at *2. Because the estate's rights as a *bona fide purchaser* would be prejudiced through a reformation, the bankruptcy court refused to allow the reformation.

On appeal, the United States District Court for the Western District of Arkansas (the "District Court") analyzed Section 544 in conjunction with Arkansas law on the rights of bona fide purchasers of real estate. The District Court found that because Section 544 specifically excludes a trustee's actual knowledge of a creditor's interest, the only issue is whether there is sufficient *constructive notice* of the creditor's interest. *Id.* at *2-3. And because the metes and bounds description in the recorded mortgage was not accurate, the District Court concluded that the trustee lacked *constructive* notice and therefore could avoid the mortgage. *Id.* at *4.

In reaching its decision, the District Court specifically disagreed with the mortgagee's admittedly persuasive logic, stating as follows:

> The Bank argues that, in this case, a basic examination of the land records would have revealed the existence of the mortgage and placed a potential purchaser on such inquiry that, if diligently pursued, would have led to knowledge of the Bank's lien. Thus, accordingly to the Bank, a subsequent purchaser in Arkansas would be charged with inquiry knowledge of the mortgage lien. The Court recognizes that this argument seems like a logical approach. The argument, however, fails because it does not correctly apply the notice laws in Arkansas in combination with 11 U.S.C. § 544(a)(3).

*Id.* Because the trustee was considered not to have any notice of the issue when the bankruptcy was filed, the District Court affirmed the bankruptcy court's ruling and held that the mortgage could not be reformed against the estate. *Id.*

This has serious implications for Fidelity's coverage obligations. In Fidelity's Denial Letter, Fidelity admits that Citi learned about the issue when the Debtor filed her bankruptcy petition and plan. Fidelity states that it should have received notice of the title defect sometime *after* Citi received notice of the Debtor's bankruptcy but *before* confirmation of the Debtor's plan. But according to 11 U.S.C. § 544(a)(3) and the Bankruptcy Court's construction thereof, the relevant date is the date of ***filing***, not confirmation. After the bankruptcy was filed, Citi lost any ability to reform the 2008 Mortgage. And Citi could not possibly have known about the issue before being sent a copy of the Debtor's petition and plan (i.e. before the Debtor filed bankruptcy). Fidelity therefore was not prejudiced by this delay. It would not have been able to reform the 2008 Mortgage even if Citi had notified Fidelity the day it received notice of the title defect. Absent prejudice, Fidelity cannot reduce its liability to PRP. It is obligated to cover the claim.

**Conclusion**

Fidelity was not prejudiced here. As the Bankruptcy Code and the case law indicate, Fidelity lost its ability to reform the 2008 Mortgage as soon as the case was filed—*not* when the case was confirmed. And Citi had no way of discovering the title issue until the Debtor filed bankruptcy and scheduled Citi as being secured only on the Vacant Land. Fidelity therefore would have had to cover this loss even if it were promptly notified of the issue.

Furthermore, if anyone suffered prejudice, it is PRP. PRP notified Fidelity as soon as it received notice of the issue. Fidelity then (a) denied coverage; (b) accepted coverage after PRP demanded reconsideration; (c) waited nearly six months to take any action in the Debtor's bankruptcy case; (d) lost at the evidentiary hearing on the Stay Relief Motion; and (e) now denies coverage more than a year after receiving PRP's initial demand.

Given the lack of any prejudice to Fidelity caused by Citi or PRP, and the extraordinary prejudice to PRP caused by Fidelity's delay, Fidelity is not excused from coverage under the Policy. PRP respectfully demands coverage of the loss.

We look forward to your prompt response. If I do not hear from you within fourteen (14) days of this letter, PRP will assume that Fidelity refuses to reconsider its coverage decision, and it will take appropriate legal action. If you need further assistance with the resolution of this matter, please do not hesitate to contact this office.

Respectfully,

Henry E. ("Ned") Hildebrand, IV

ELECTRONICALLY FILED
Miller County Circuit Court
Mary Pankey, Circuit Clerk
2017-Oct-31 09:26:47
46CV-17-447
C08SD02 : 5 Pages

**Fidelity National Title**
**Insurance Company**

August 16, 2017

*VIA MAIL AND EMAIL*

Dunham Hildebrand, PLLC
Attn: Henry E. Hildebrand, IV
1704 Charlotte Avenue, Suite 105
Nashville, Tennessee 37203
Ned@dhnashville.com

| RE | Claim No.: | 547729 |
|---|---|---|
| | Policy No.: | 2652792VT |
| | Named Insured: | Citicorp Trust Bank, FSB |
| | Borrower: | Andrea Paige Attaway and Marc W. Attaway |
| | Property: | 299 PR 108, Fouke, Arkansas 71837 |

Dear Mr. Hildebrand:

This letter is to inform you that Fidelity National Title Insurance Company, as successor in interest to Lawyers Title Insurance Corporation (the "Company"), has reviewed the information submitted on June 22, 2017, by you on behalf of US Bank, National Association, as Trustee of the PRP II PALS Investments Trust (the "Claimant") requesting reconsideration of the Company's supplemental coverage determination ("Second Reconsideration Request"), set forth in the letter to you dated June 1, 2017 ("Supplemental Coverage Letter"). Based on the information provided below, the Company affirms its position that liability for this matter has terminated and thus this claim is respectfully denied.

The Company will restate its understanding of the facts surrounding the claim as follows: On or about December 27, 2003, Jason Charles Temple and Diane Temple conveyed a ten acre tract of land with improvements commonly known as 299 PR 108, Fouke, Arkansas ("10 Acre Tract") to Andrea Paige Attaway (the "Debtor-Borrower"). On December 22, 2003, the Debtor-Borrower and Marc W. Attaway obtained a mortgage from Limited Liability Partnership in the amount of $148,500.00 ("2003 Mortgage") encumbering the 10 Acre Tract. On or about November 5, 2004, Jason Charles Temple and Diane Temple conveyed thirty acres of vacant land ("30 Acre Tract") to the Debtor-Borrower. On March 3, 2008, the Debtor-Borrower and Marc W. Attaway obtained a loan in the amount of $184,774.86 (the "Loan") from Citicorp Trust Bank, FSB (the "Insured"). As security for the Loan, the Borrowers granted a mortgage (the "Insured Mortgage") encumbering the 30 Acre Tract to Mortgage Electronic Systems, Inc. ("MERS") solely as nominee for the Insured. In connection with this transaction, the Company issued a title commitment to the Insured with an effective date of February 14, 2008 ("Title Commitment"). Subsequently, the above-referenced loan policy of title insurance (the "Policy") was issued to the Insured, with an effective date of March 3, 2008.

**EXHIBIT 10**

As stated in the Supplemental Coverage Letter, on October 12. 2012, the Debtor-Borrower filed her Chapter 13 Voluntary Petition. Debtor-Borrower listed the Insured Mortgage in schedule D on the 30 Acre Tract. The Debtor-Borrower listed the 10 Acre Tract as exempt and unencumbered by any lien or mortgage. On November 19, 2012, CitiMortgage, then holder of the Insured Mortgage, filed proof of claim. Subsequently, the Court confirmed the plan, providing for the surrender of the 30 Acre Tract and no payments to the holder of the Insured Mortgage. Pursuant to 11 U.S.C. § 1327(a), *the provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.* CitiMortgage received its last payment from the Borrowers on July 17, 2012. On March 18, 2013, an amendment of the plan was filed. The amended plan was confirmed by the Court on April 17, 2013.

On August 27, 2013 CitiBank N.A., successor in interest by merger to Citicorp Trust Bank, FSB assigned the Insured Mortgage to Christiana Trust, a division of Wilmington Savings Fund Society, FSB, as Trustee of Normand Mortgage Loan Trust, Series 2013-8 ("Christiana Trust") via an Assignment of Mortgage recorded September 11, 2013, as Instrument Number 2013R008620. On April 10, 2015, Christiana Trust assigned the Insured Mortgage to Normandy Mortgage Acquisition Company LLC c/o The Palisades Group, LLC ("Normandy Mortgage") via an Assignment of Mortgage recorded June 3, 2015, as Instrument Number 2015R004577. Subsequently, Normandy Mortgage assigned the Insured Mortgage to the Claimant via an Assignment of Mortgage recorded June 3, 2015, as Instrument Number 2015R004578.

The Company received your initial request to open a claim on April 25, 2016, wherein you allege the Claimant learned after the assignment of the Insured Mortgage that the Insured Mortgage does not describe the alleged intended Property, specifically the improved 10 Acre Tract ("Legal Description Issue"). You allege the Title Commitment lists both the 30 Acre Tract and 10 Acre Tract, less and except the 10 Acre Tract. Further, it was alleged the Title Commitment and Mortgage failed to follow the legal description of the 2003 Mortgage encumbering the 10 Acre Tract, as the 2003 Mortgage was to be paid in full and replaced by the Insured Mortgage. The Company denied coverage for the claim pursuant to the letter to you, from the Company dated June 10, 2016 (the "Coverage Letter").

On June 29, 2016, the Company received a letter from you requesting reconsideration of the Company's determination set forth in the Coverage Letter ("First Reconsideration Request"). You allege the Coverage Letter was inappropriate for two reasons: (1) Endorsement 7-06, which is expressly incorporated into the Policy in Schedule A, obligates the Company to insure against the loss; (2) In the event that the Company is not required to insure the 10 Acre Tract, it is required to insure title to the 30 Acre Tract. You alleged title to the 30 Acre Tract is not marketable as the 30 Acre Tract is landlocked and inaccessible absent entry through the 10 Acre Tract.

In response to your First Reconsideration Request and taking into consideration additional information provided to the Company, the Company accepted coverage for the Legal Description Issue and for an access issue to the 10 Acre Tract, subject to the terms and conditions of the Policy, pursuant to the letter dated August 5, 2016 ("First Reconsideration Response"). Please note, the Policy issued to the Insured does not indicate that Endorsement 7-06 is incorporated within the Policy. The Endorsement 7-06 you provided to the Company fails to provide a policy number to

demonstrate it was issued with the Policy to the Insured. The Company also has no records that the Company received payment for the alleged Endorsement.

Upon acceptance of coverage the Company continued to investigate the claim matter. On October 13, 2016, the Company retained Diana Borgognoni Snyder, of Wright, Lindsey & Jennings, LLC to reform the legal description of the Insured Mortgage to encumber the 10 Acre Tract and to establish legal access. Before filing the Motion for Relief from Automatic Stay, retained counsel reached out to the Debtor-Borrower's bankruptcy counsel to negotiate whether the parties would be willing to execute an agreed order lifting the stay in order to reform the Insured Mortgage and establish access. The bankruptcy counsel would not agree to execute an agreed order, therefore on January 27, 2017, a Motion for Relief from Automatic Stay was filed requesting the Court to grant the Claimant relief from the automatic stay under 11 U.S.C. § 362(d)(1) in order to proceed with a civil case in Miller County Circuit Court to reform the Insured Mortgage to encumber the proper tract of land and to establish an easement for access (the "Motion").

On February 1, 2017, the Debtor-Borrower filed a Response to the Motion for Relief from Automatic Stay generally denying all material allegations and requesting the motion to be denied (the "Response"). On March 14, 2017, the court heard the Motion and Response. On April 27, 2017, Honorable Richard D. Taylor entered an Order denying the Motion.

You assert in your Second Request for Reconsideration that CitiMortgage lost its ability to cure the title defect as soon as the Borrower filed for bankruptcy and the failure to notify Fidelity or object to the confirmation of the Borrower's Bankruptcy plan is irrelevant. You base your foregoing argument on *First State Bank of Crossett v. Caine*, 2014 WL 1332055. Further, you argue that CitiMortgage could not reasonably have discovered the title issue until the Borrower filed her bankruptcy case, thus the Company was not prejudiced by CitiMortgage's failure to disclose the title issue before confirmation of the Debtor's plan. As discussed below, the Company must respectfully disagree with the arguments made in the Second Reconsideration Request.

The facts in *Caine* differ and therefore, the findings do not apply to this claim. In *Caine*, the legal description in the mortgage, was defective because it omitted a specific call, thus the description did not close and resulted in the shape of the letter "L." The court held that the Caines could not be charged with having constructive notice of the mortgage lien in the records because the mortgage lien in the records did not describe definite land. Further, the court concluded that the land description in the deed was not helpful because the land intended to be encumbered by the mortgage could have been a smaller portion than the land described in the deed. Extrinsic evidence would be needed in *Caine* to ascertain what property is subject to the mortgage lien. The Bankruptcy Court reasoned the recorded mortgage containing the erroneous land description does not put a bona fide purchaser on constructive notice because it is impossible to tell exactly what land is being described. The Bankruptcy Court further found that, because the Caine's rights as bona fide purchaser would be prejudiced if the mortgage were reformed the Caines could avoid the mortgage lien pursuant to 11 U.S.C. § 544(a)(3).

This claim matter submitted to the Company is distinguishable from *Caine*. Unlike *Caine*, the Insured Mortgage describes a definite piece of land providing a bona fide purchaser with notice of the Insured's interest in the Debtor-Borrower's property. As such, CitiMortgage was provided notice of the Debtor-Borrower's Chapter 13 Voluntary Petition and bankruptcy plan. Bankruptcy

Code § 362(d), provides that the Bankruptcy Court may grant relief from the automatic stay for cause. *Blan v. Nachogdoches Cnty. Hosp. (In re Blan)*, 237 B.R. 737 (B.A.P. 9th Cir. 1999). Congress did not define cause, it is intended that the automatic stay could be lifted to allow litigation involving the debtor to continue in a non-bankruptcy forum under certain circumstances. *Id.* As stated in the Order, in deciding whether to grant relief from stay to allow litigation involving the debtor to proceed in state court forum, the bankruptcy court must balance potential prejudice to the debtor, to the bankruptcy estate and to other creditors against the hardship to the moving party if it is not allowed to proceed in state court. In this case, the debtor benefited from the Insured Mortgage by paying off the 2003 Mortgage. Additionally, as noted in the bankruptcy plan, Debtor-Borrower listed the 10 Acre Tract as exempt and unencumbered by any lien or mortgage, therefore there would have been no prejudice to any lien creditors.

Further, among the factors the bankruptcy court considers, in deciding whether to grant relief from stay to allow litigation involving a debtor to proceed in non-bankruptcy forum, are the following: (1) judicial economy; (2) trial readiness; (3) the resolution of preliminary bankruptcy issues; (3) the resolution of preliminary bankruptcy issues; (4) creditor's chance of success on merits in other forum; and (5) the cost of defense or other potential burden to bankruptcy estate and impact of litigation on other creditors.

As discussed in the Supplemental Coverage Letter, neither the Claimant nor its predecessors initiated a reformation proceeding or asserted its reformation claim after receiving notice and prior to confirmation of the plan or amended plan despite the absence of payments prior to bankruptcy, full disclosure in the Debtor's bankruptcy schedules, and an opportunity to object to the plan and resolve the matter in the bankruptcy court or a non-bankruptcy forum. Additionally, CitiMortgage received sufficient notice as it filed a proof of claim on November 12, 2012. As stated, Bankruptcy Code § 362(d), provides that the Bankruptcy Court may grant relief from the automatic stay for cause. After CitiMortgage received notice of the bankruptcy, CitiMortgage could have objected to the bankruptcy plan and requested an automatic stay to reform the Insured Mortgage before the bankruptcy plan was confirmed. Therefore, your argument that the Company was not prejudiced by CitiMortgage's failure to disclose the title issue before confirmation of the Debtor's plan is wholly displaced. Due to the bankruptcy plan being confirmed, the plan is now binding and res judicata prevents the Company from seeking reformation of the Insured Mortgage. The Company first became aware of the Bankruptcy and confirmed plan in or around June of 2016, pursuant to an email sent by you to the Company dated June 6, 2016.

Further, the Company's position as stated in its Coverage Letter, First Reconsideration Response, and Supplemental Coverage Letter did not waive, invalidate, forfeit, or modify any of the Company's rights under the Policy. The Company specifically reserved its rights pursuant to paragraph 3 of the Policy's Conditions:

*CONDITIONS*

***3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT***

*The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured*

> *Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title.* ***If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.***

The Company would further like to direct your attention to paragraph 1(e), which states in relevant part:

> *(e) "Insured": The Insured named in Schedule A.*
> *(i) the term "Insured" also includes*
> *(A) The owner of Indebtedness and each successor in ownership of the Indebtedness...*
> *(ii) With regard to (A), (B), (C), (D), and (E)* ***reserving, however all rights and defenses as to any successor that the Company would have had against any predecessor Insured...***

The Company's reservation of rights was predicated on the above-cited Policy provisions, as the failure to provide timely notice of the bankruptcy plan in the pending bankruptcy prejudiced the Company's opportunity to object to the proposed plan and seek reformation of the Insured Mortgage prior to the Court Order confirming the plan.

Accordingly, no new information has been provided that changes the Company's coverage determination as set forth in the Supplemental Coverage Letter.

Please note that reference to any provision of the Policy in this letter shall not be construed as a waiver of any other term or provision of the Policy. The Company retains the right to supplement this letter. Also, please be advised that the Company reserves the right to deny this claim based on additional grounds. This coverage determination is based upon the information presently known to the Company. If there is any information that is unknown to the Company as of the making of this determination that may alter such determination, please provide this information as soon as possible, and this claim will be reevaluated.

If the Company does not receive any additional materials from you within thirty (30) days of the date of this letter, the Company will close its claim file. Should you have any questions or concerns regarding this matter, please contact me directly at Holland.Hawkins@fnf.com or 904-701-6166. **Please include the above-referenced claim number in all communications with the Company.** Thank you.

Kind Regards,

Holland P. Hawkins
Claims Counsel, AVP